## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

RANDALL BLANCHARD

     *Plaintiff*,

v.

                                        Case no.: 7:25-cv-2971

KYNDRYL HOLDINGS INC.

     *Defendant*.

## PLAINTIFF RANDALL BLANCHARD'S SECOND AMENDED COMPLAINT

     Plaintiff Randall Blanchard brings this action against Kyndryl Holdings, Inc. (Kyndryl) under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 – 634 (ADEA). Plaintiff alleges as follows:

## I.     STATEMENT OF THE ACTION

### A. INTRODUCTION.

1.     Plaintiff Blanchard's career was cut short when he was fired due to his age by Kyndryl as a result of an ageist scheme that Kyndryl carried over from IBM after it was spun off as a separate company in 2021.[1]

2.     The scheme—which is in effect a discriminatory corporate transformation plan aimed at reducing company-wide employee age—has been the subject of numerous age discrimination lawsuits[2] against both IBM and Kyndryl. ProPublica extensively investigated and documented

---

[1] https://www.kyndryl.com/us/en/about-us/leadership; The scheme was carried over by former IBM executives that moved to Kyndryl when it was spun off. To wit, twenty-one of thirty-four of the listed senior leaders of Kyndryl previously worked for IBM.

[2] The illegal scheme of IBM is further corroborated by the Exhibits attached to the Amended Complaint in *Townsley v. IBM*, Case 1:20-cv-00969-LY ECF. 5 (filed 10/07/20); *see also Doheny v. Int'l Bus. Machines, Corp.*, 714 Supp. 3d 342, 378 (S.D.N.Y. 2024).

IBM's nefarious multi-year plan to target and replace older workers in when Kyndryl's highest executives were still at IBM.[3]

3.      Present day Kyndryl was spun-off from IBM in November of 2021. At its inception, Kyndryl was comprised of substantially all of the business group formerly known at IBM as Global Technology Services (GTS). At IBM, GTS was a 100,000 plus employee organization, the largest operating unit at IBM for decades. As such, the culture, operating norms, and strategies developed by GTS held great sway at the IBM corporation overall. Since inception, Kyndryl's CEO has been former IBM CFO Martin Schroeter.

4.      There is a direct line between actions taken over the years by GTS—as part of IBM—that carry through to present day Kyndryl. Those actions include the long and well-documented history of IBM's employment discrimination scheme—which is based in the belief that older workers needed to be aggressively replaced by younger, less-experienced employees, regardless of qualifications. Specifically, IBM's ageist employment scheme was substantially fomented in the GTS business group before it was spun off as Kyndryl.

5.      While Martin Schroeter was the IBM Chief Financial Officer, an internal analysis was undertaken that showed GTS had a significantly older workforce than its primary competitor. IBM Finance pinpointed that its workforce was approximately 20 years older on average than its competitor—which was viewed as a significant competitive disadvantage. From that analysis, a multi-year strategic plan was established to remove older workers via Resource Actions and replace them with younger, less experienced Early Professional Hires, fresh college graduates, and

---

[3] Peter Gosselin, *The U.S. Equal Employment Opportunity Commission Confirms a Pattern of Discrimination at IBM*, PROPUBLICA, (Sept. 11, 2020), available at
https://www.propublica.org/article/the-u-s-equal-employment-opportunity-commission-
confirms-a-pattern-of-age-discrimination-at-ibm.

younger offshore labor. The initial plan targeted removing approximately tens of thousands of GTS employees.

6.      In March 2018, ProPublica published the investigative report entitled "Cutting Old Heads at IBM" which laid bare IBM's efforts to illegally reduce the age of its workforce.[4] With that article as a backdrop, in April 2018 while reviewing an HR presentation for an upcoming strategic meeting, the then-head of IBM HR Diane Gherson praised a subordinate's analytic work but advised caution because the work was engaging in age profiling. Despite that warning, the presentation was subsequently given to Martin Schroeter—now current Kyndryl CEO.

7.      The HR presentation made to Schroeter recommended targeting employees with a "low propensity to learn" and continuing to "remix the employee population with EPH's." Propensity to Learn is one of many analytically modeled criteria that was highly correlated with age for ranking employees that unfairly and dis-proportionately targeted older workers. Several days after the HR presentation, Schroeter directed his team to expand EPH hiring and continue to remix the employee population.

8.      In a subsequent leadership meeting, the head of IBM HR touted to fellow SVP's— including current IBM CEO Arvind Krishna, Schroeter, and the then-current head of GTS—the success of ongoing efforts to reduce the average age of the workforce. Bluntly, it was reported that IBM had successfully implemented its "separate and replace" strategy.

9.      Responding to the ProPublica article and an avalanche of worker complaints in August 2020, the Equal Employment Opportunity Commission issued a rare public finding that IBM had

---

[4] Peter Gosselin, *Cutting 'Old Heads' at IBM*, PROPUBLICA (March 22, 2018) available at, https://features.propublica.org/ibm/ibm-age-discrimination-american-workers/.

"discriminated against Charging Parties and others on account of their age."[5] Amongst the 62 Charging Parties, there were at least several known to work in the GTS business unit of IBM, likely more. Despite the enormity of the findings, IBM leadership—including Kyndryl CEO Martin Schroeter—undertook no corrective action in response to the 2020 EEOC findings.

10.    In August 2021, current IBM HR executive Sam Ladah—who had previously been the head of GTS HR—provided a sworn declaration to support keeping certain, highly damaging documents confidential in the *Townsley, et al vs. IBM* matter. Mr. Ladah stated that "even though some of the documents are five to six years old, they provide insight into IBM's decision making *that are still being used today*."[6]

11.    A little more than two months after Ladah's sworn declaration, the IBM business group largely known as GTS was spun-off into the stand-alone public company Kyndryl. Martin Schroeter was named as Kyndryl CEO, and he moved from IBM to the new spin-off company to fill that role. Interestingly, Schroeter was officially named as Kyndryl CEO on January 1, 2021, some 10 months before the official spin-off, making clear that Kyndryl had been operating as a shadow organization inside IBM for some time before the official spin-off.

12.    Large, complex divested businesses do not spring to life fully formed and able to independently function successfully. Instead, the newly-divested business is able to continue without interruption only by borrowing, adopting, and transferring operating processes, business strategies, and culture that existed at the parent company before divestiture. Given the high concentration of former IBM executives (including Schroeter) who now comprise the senior

---

[5] **Ex. 1**, IBM Corporation's U.S. EEOC Determination, pgs. 1-2 (September 3, 2020) (emphasis added).
[6] *See* Decl. of Sam Ladah, *Townsley v. Int'l Bus. Machines Corp.*, No. 1:20-cv-00969-LY, Aug. 27, 2021 (WDTX) ECF No. 59-2. (Emphasis added.)

leadership of Kyndryl, it is alleged upon information and belief that Kyndryl adopted IBM's layoff standard operating procedures wholesale—and specifically adopted and continued IBM's ageist scheme of firing older workers to make room for younger employees.

13.     As evidence of Kyndryl continuing this ageist scheme post spin-off, one needs to look no further than the circumstances of Randall Blanchard's termination and compare those to the facts found sufficient to proceed in the *Doheny vs. Kyndryl* matter.[7] The exact same fact patterns, the exact same identified discriminatory animus, and the exact same language used in separation materials are found in both terminations. Moreover, these identical sets of terminations are both wholly consistent with actions previously found to be discriminatory by numerous courts and government regulatory bodies.

### B.     HOW IBM'S SCHEME WORKS AND HOW IT CONTINUES AT KYNDRYL.

14.     Beginning several years ago, the executive leadership of IBM—many of whom moved over to become executives at Kyndryl and brought the same ageist layoff scheme with them—began to use a series of company-wide methods to target and eliminate older workers while contemporaneously hiring younger employees ("Early Professional Hires" or "EPH") and exempting those younger workers from the ongoing rolling layoffs. A cadre of top executives developed the plan in a way that included weaponizing artificial intelligence and scoring algorithms against older workers by using age-correlated selection criteria, as well as biased predictive analytics.

15.     Human Resources implemented the plan by using the unfairly-weighted criteria and analytics to pre-select employees for layoff without consulting first line managers. Finance made the math work and provided the business case for mass exits of older employees. Cognizant that

---

[7] *Doheny*, 714 Supp. 3d at 378.

its efforts to "revitalize" its workforce violated anti age-discrimination laws, the Legal Department devoted significant time and resources to devising tactics and procedures to avoid detection and create plausible deniability. In relevant part to this lawsuit, this blueprint of the scheme was continued at Kyndryl in furtherance of the same ageist goals.

16.     IBM used veiled corporate language—which was crafted and employed by high level executives many of whom are now at Kyndryl—to obscure that the actions being taken were designed to fire the old to make way for the young. These executive planning documents are replete with terms such as "Early Professional Hire," "seniority mix," "skills remix," "next generation," "refresh," "revitalization hiring," "reinvention of the workforce," and "transformation"—catchy corporate coded language that permitted executives to speak about illegal discrimination in a way that avoided detection, gave cover, and provided plausible deniability.  As discussed *supra*, in late 2021—after Martin Schroeter was named CEO of Kyndryl internally and immediately prior to the spin-off of Kyndryl—the former head of GTS HR Sam Ladah confirmed that many of these documents "provide insight into decision-making processes that are still being used today."[8]

17.     To execute the scheme, executives—many of whom are now at Kyndryl—mandated companywide rolling layoffs. These layoffs were labeled "Resource Actions," which is corporate nomenclature previously unique only to IBM. Kyndryl now uses the same unique term—Resource Actions—for its ongoing rolling layoffs. This is telling that the IBM practices, including the discriminatory scheme, have carried over to Kyndryl. The "Resource Actions" at both companies have been implemented companywide—but have been purposefully broken up into smaller sub-groups to better shroud its discriminatory animus in secrecy.

---

[8] *See* Decl. of Sam Ladah, *Townsley v. Int'l Bus. Machines Corp.*, No. 1:20-cv-00969-LY, Aug. 27, 2021 (WDTX) ECF No. 59-2.

18.     From the high echelons of IBM—and now Kyndryl—orders were given to first line managers to create impossible-to-meet performance goals for older workers. Failure to achieve the impossible was then used to create baseless negative performance reviews to justify subsequent terminations. Another technique of the scheme was to artificially reduce employees' favorable performance review scores, using age correlated scoring models and algorithms designed to segregate older workers into defined categories, akin to the discriminatory practice of redlining— which gave additional cover for terminations.

19.     Kyndryl's HR department and its executives several levels up from an employee's first line manager would place employees on secret internal "Resource Action" or "RA" lists that marked them for termination, before their managers even knew that their subordinate had been pre-selected for termination. The managers are then used as unwitting "cat's paws" for the discriminatory termination pre-approved by HR. Kyndryl's HR would then obfuscate this termination decision to make it seem like it was actually the first-line manager's decision to terminate that employee.

20.     Prior to the Kyndryl spin-off, in *Langley v. IBM*, a Federal Court in Texas analyzed this exact issue, and ruled that "internal IBM corporate planning documents" provided cause for the Court to conclude that a fact question existed as to whether "IBM executives sought to lay off older workers in an effort to hire a younger workforce."[9] The Court additionally determined that evidence existed that IBM's hire-and-fire scheme effectively told first-line managers who to lay off, and then used those managers to further conceal IBM's top-down ageist animus.[10] The

---

[9] *Langley v. Int'l Bus. Machines Corp.*, No. 1:18-CV-443-DAE, 2020 WL 8052973, at *4 (W.D. Tex. Feb. 28, 2020) ("In this case, the evidence creates a factual issue as to whether [the first-line manager] was in fact effectively told whom to lay off, as well as whether her and her supervisors' attempts to place [the employee] in different positions were overruled by HR and IBM executives.").
[10] *Id.*

Southern District of New York has also weighed similar documents—and declared that they would be "directly relevant" to the same ADEA claims made here and would "on their face appear to show an effort to remove older employees in favor of younger employees."[11]

21.    While actively firing its older workers, Kyndryl has been simultaneously busy hiring young employees *en masse* to replace the laid-off older workers. To hide the replacement, Kyndryl frequently creates different job titles and shifts organizational structures to make it harder to detect that it had not eliminated a position, but instead merely replaced older workers with younger workers.[12]

22.    Kyndryl, on information and belief, also employs complex and byzantine procedures it adopted from IBM to prevent targeted older employees from finding new jobs at Kyndryl for which they were qualified. This includes policies or operational practices that prohibit older laid-off employees or executives from transitioning into new internal roles or new jobs at a lower level.

### C. KYNDRYL'S EXECUTIVE STATEMENTS, CONDUCT, RECRUITING MATERIALS, AND PUBLICATIONS ALSO REFLECT THAT THEY RETAINED IBM'S AGE ANIMUS.

23.    Kyndryl CEO Martin Schroeter continued IBM's massive "reinvention" and rebranding campaign aimed at attracting younger employees at Kyndryl.  Younger employees are key for Kyndryl, because the company is faced with competition from other companies acquiring younger workers in the tech sector and beyond. The Kyndryl leadership has displayed discriminatory animus—including expressing the belief that older workers constitute a poor return on investment because they lack the ability to learn new skills, to embrace changing technology, or to collaborate with their colleagues.

---

[11] *Lohnn v. Int'l Bus. Machines Corp.,* No. 21-CV-6379-LJL, 2022 WL 364320, at *12, *6 (S.D.NY. Jan 4, 2022), appeal withdrawn, No. 22-32, 2022 WL 182320899 (2d Cir. July 25, 2022).
[12] KYNDRYL, CAREER PAGE, https://www.kyndryl.com/us/en/careers (last visited May 5, 2025).

24.    Current marketing materials from Kyndryl shows the company not-so-subtly advertise the young age demographics it seeks:[13]



---

[13] KYNDRYL, CAREER PAGE, https://www.kyndryl.com/us/en/careers (last visited May 5, 2025).





**Fresher Openings**
162,024 followers
5mo

Kyndryl Off Campus Drive 2024 : Hiring Freshsers | Apply Now

#ManagementConsultant #WorkFromHome #JobOpening #WorkFromHome #Hiring2024 #RemoteWork #WFHJobs #Recruitment #TechJobs #FreshersHiring #JobOpportunities #WorkFromHomeJobs #JobSearch #HRExecutive #Recruiter #TestingEngineer #Tech #Opportunities #ApplyNow #FreshersJob #JobAlert #work #quality #smartwork #money #india #linkedin #letsconnect

Join Our Telegram Channel for Instant Job Notifications : https://t.me/freshopening

https://lnkd.in/gjpXvsvt

25.    Similarly, the discriminatory animus of IBM executives—many of whom are now Kyndryl's executives—is likewise well documented. As the New York Times widely reported, "executives discussed in emails how to force out older workers and derided them as 'dino babies' who should be made an 'extinct species.'"[14]

26.    The evidence corroborates that the scheme has continued at Kyndryl without a hitch. For example, Kyndryl executives—while actively conducting layoffs that disproportionately impacted its older employees—publicly characterized employees based on ageist stereotypes by writing that "baby boomers seek stability and Gen Z crave freedom."[15] Kyndryl also published an article about why creating a workplace that is attractive to Gen Z is "good for business."[16]

---

[14] Noam Scheiber, *Making 'Dinobabies' Extinct: IBM's Push for a Younger Work Force,* THE NEW YORK TIMES (February 12, 2022), available at https://www.nytimes.com/2022/02/12/business/economy/ibm-age-discrimination.html; Jack Kelly, *IBM Accused of Ageism: Older Workers are 'Dinobabies' Who Should be Made an Extinct Species,* FORBES (February 12, 2022), available at https://www.forbes.com/sites/jackkelly/2022/02/12/ibm-accused-of-ageism-older-workers-are-dinobabies-who-should-be-made-an-extinct-species/.
[15] **Ex. 2**, Statement by Rajita Singh, a Chief People Officer at Kyndryl.
[16] **Ex. 3**, The Sustainable Digital Workplace by Kyndryl.

### E. KYNDRYL CONTINUES TO DISCRIMINATE ON THE BASIS OF AGE.

27.    In early 2022, not long after the spin-off, Kyndryl customer marketing materials went to great pains to identify the average age of its workers was 35 to alleviate customer concerns over its "workforces' ability to rejuvenate."[17] Kyndryl then subsequently ***scrubbed*** that age reference in its marketing materials after investigative journalists pointed out the obvious connections to its discriminatory history.[18]

28.    Kyndryl makes no secret that it has used IBM infrastructure and processes at least as recently as Mr. Blanchard's termination. In its 2023 10K filing with the Securities and Exchange Commission, Kyndryl stated "[s]ince the Spin-off, we have been dependent on financial and business operations systems that are provided by IBM."[19] Kyndryl also admitted that it had been "experiencing difficulties in implementing [their] new enterprise resource planning system." This is a clear admission that Kyndryl was still reliant on IBM's HR related systems and processes at that time because they could not get their own online.[20]

29.    As further proof of this point, consider the side-by-side comparison of both companies' identically named "Employee Information Package," which were received by (1) a recently terminated IBM employee, and (2) Plaintiff Blanchard. Both were issued in Spring 2023. The language is virtually identical. The formatting is virtually identical. The graphics are identical.

---

[17] **Ex. 4**, Kyndryl Mainframe Workforce Transformation Service.
[18] **Ex. 5**, Thomas Claburn, The Register, Kyndryl Doc Leak Hints at Potential Age Discrimination.
[19] **Ex. 6**, Excerpt from Kyndryl's 2023 10K filing with SEC; United States Securities and Exchange Commission, *Kyndryl Form 10-K*, *Severance Plan*, SEC ARCHIVES, (March 10, 2022).
[20] *Id.*

**IBM Employee Information Package:**     **Kyndryl Employee Information Package:**



30.     In addition to cribbing former IBM HR processes, documents, and procedures, Kyndryl leased certain infrastructure and back-office support functions from IBM for a period of at least two years via a Transition Services Agreement.[21] Included in those leased services would have been access to HR and Finance capabilities and programs that were the foundation of IBM's age discriminating layoff scheme. Recent reporting confirms that Kyndryl has retained the scheme and

---

[21] United States Securities and Exchange Commission, *Kyndryl Form 8-K, Transition Services Agreement,* SEC ARCHIVES, (November 1, 2021), available at https://www.sec.gov/Archives/edgar/data/1867072/000110465921134456/tm2131654d1_8k.htm.

is using it. Kyndryl has terminated hundreds of employees in the past few years—and like the IBM scheme that it replicated, the terminated group is disproportionally made up of older workers.[22]

31.     There is no need to rely solely on pattern recognition, although it is compelling. In two separate age discrimination lawsuits filed against Kyndryl related to 2023 layoffs, *Doheny vs. IBM et al,* and this matter, the average ages of employees selected for termination, based on data supplied by Kyndryl itself, were 55 and 53, respectively.[23] This is significantly older than the average employee age of 35 referenced in their customer materials discussed *supra*.

## II.    PARTIES

32.     Plaintiff Randall Blanchard is a citizen of the United States and a is a resident of Alabama. He timely filed a charge of age discrimination with the EEOC after he was terminated at age sixty-one (61) as a direct result of Kyndryl's adoption of IBM's ageist scheme to fire its older workers.[24]

33.     Plaintiff herein was in the protected group of the ADEA at the time of the adverse employment action. Plaintiff was entitled to protection consistent with the goals promulgated by the ADEA.[25] Plaintiff was discriminated against through this illegal scheme that resulted in an adverse employment action due to his age. Plaintiff now bring this case to vindicate his rights under the ADEA and State law.[26]

---

[22] Thomas Claburn, *Leaked Kyndryl files show 55 was average age of laid-off US workers*, THE REGISTER (May 2023), available at
https://www.theregister.com/2023/05/24/kyndryl_ibm_layoffs/.
[23] *Doheny v. IBM and Kyndryl,* No. 23-CV-3962 (RA), 2024 WL 382142 (S.D.N.Y. Feb. 1, 2024), *see* **Ex. 7**, Kyndryl Age Disclosure Provided to Blanchard.
[24] *See* **Ex. 9**, *Blanchard EEOC Charge*, **pg. 1 – 7**.
[25] **Ex. 8**, "The State of Age Discrimination and Older Workers in the U.S. 50 Years After the Age Discrimination in Employment Act (ADEA)" by Victoria A. Lipnic, Acting Chair of the U.S. Equal Employment Opportunity Commission.
[26] *Id.*

34.     Defendant Kyndryl is a Delaware corporation with its principal place of business in New York, New York. Kyndryl is a company that IBM spun-off largely from its Global Technology Services Group (GTS) in late 2021. In its current form, Kyndryl continues the work of GTS and designs, builds, and manages information technology systems for its clientele.

### III.      JURISDICTION AND VENUE

35.     This Court has subject matter jurisdiction over Plaintiff's claim under 29 U.S.C. § 626(b), which authorizes federal jurisdiction over any action to enforce the ADEA. Accordingly, this Court has federal question jurisdiction pursuant to 28 U.S.C. §1331 and 28 U.S.C. § 1343 because the Plaintiff is a natural person seeking redress for Defendants' violations of their civil rights under the ADEA.

36.     This Court has supplemental jurisdiction over Plaintiff's related state law claims under 28 U.S.C. § 1367.

37.     Venue is proper in the Southern District of New York with regard to Defendant Kyndryl under 28 U.S.C. § 1391 because Kyndryl has its headquarters in New York, New York.

### IV.      EXHAUSTION OF ADMINISTRATIVE REMEDIES

38.     Plaintiff timely filed a Charge of Discrimination with the EEOC and equivalent state agency alleging age discrimination within the requisite statutory period. This filing occurred within 180 days of the unlawful employment practices alleged in this Complaint. More than 60 days have passed since the filing of these charges.

### V.      FACTS

39.     Plaintiff Randall Blanchard suffered an adverse employment action from Kyndryl. Blanchard would not have suffered this adverse action but for Kyndryl's adoption and continued

use of IBM's ageist scheme—as described *supra*—after Kyndryl was spun-off as a separate company in 2021.

40.    Randall "Randy" Blanchard began his career with IBM in 1988. He started at the bottom and in the following 35 years successfully worked his way into a top Band 10 sales position. Inside IBM and Kyndryl, Band 10 positions are the highest non-Executive positions. Such positions are attained by a very small percentage of highly trained, highly regarded, and highly successful professionals.

41.    During his tenure at IBM Blanchard was very familiar with programs to attract and retain young workers. Many of these programs went by coded names like "Summit." As part of these programs there were marketing materials intended to attract and recruit young employees to the company. Internally, managers had specific targets for the number of young employees or Early Professional Hires or "EPH" they were expected to hire.

42.    Blanchard voluntarily transitioned to Kyndryl in September 2021. After transitioning to the spin-off, Blanchard saw Kyndryl utilize the same marketing strategies and tactics employed by IBM. This included marketing specifically intended to attract young employees; and providing job protections afforded only to young employees. These tactics were intended to disproportionately attract, recruit, and retain young employees.

43.    In May 2023, some twenty months after transferring to Kyndryl, his employment as a Sales Partner was terminated. At the time of his dismissal, Blanchard was 61 years old.  He was one of the oldest members of his team. He and the other oldest member of his group were targeted, selected, and terminated as a result of the Resource Action. The Resource Action that terminated Blanchard's employment was companywide. On information and belief, newly hired young employees known as EPH were exempted from consideration for the Resource Action.

44.     When Blanchard was given notice of his termination at Kyndryl by his immediate first-line manager—Blanchard inquired about how and why he was chosen. Blanchard was advised by his first-line manager that his termination was not based on his skills and that HR had sent the names of those to be terminated to his manager. Notably, Mr. Blanchard's first line manager admitted that he did not participate in the selection of Mr. Blanchard for termination. The selection of individuals for termination by someone other than their direct manager, who is in the best position to understand their performance and capabilities, comes right out of the IBM discriminatory playbook. The script utilized by his manager was substantially the same as the script utilized by IBM's managers during its Resource Actions at the same time. The severance documents provided to Blanchard and Kyndryl employees were nearly identical to IBM's.

45.     During the call to notify him he was being laid off, Mr. Blanchard's manager pointed out that the Resource Action and the severance options were akin to IBM's Resource Actions. He stated, "you have probably seen these things before, IBM has done this before; you have probably seen it in your illustrious 30 year plus career there."

46.     Blanchard was given the impression by his manager that that any efforts to find another job internally would be fruitless. He was told specifically that there was "not a landing spot for you." Other employees who were laid off by Kyndryl around the same time were told it would be "futile to look for other positions" because Kyndryl "was looking for younger employees or 'new blood.'"[27]

47.     Human Resources offered no assistance in finding Blanchard a new role. Blanchard applied for open positions within the company and, despite being eminently qualified, was rejected for each position he applied for via an automated email response. In the meantime, Kyndryl was

actively recruiting and hiring young employees both domestically and abroad while Blanchard was being precluded from transferring into an open role because of his age.

48.     Accordingly, on information and belief, Kyndryl employed tactics designed to disparately impact older employees who had been eliminated through Resource Action. This was done by preventing older employees from finding new positions in the company, as Kyndryl wanted to save these positions for young employees.

49.     Blanchard's legacy at IBM, which continued with Kyndryl, was one of excellence. He had positive performance reviews, promotions, awards, and earned bonuses. This sustained excellence was rewarded with numerous "100% Club" and "Golden Circle" awards for sales performance. For over 20 years, Blanchard specialized in developing customer relationships and being an expert on the technical needs of financial services industry—which were clients whose needs were met by Blanchard at IBM and then later Kyndryl. Just a short time before being terminated, Blanchard had the title of Director, Sales Partner, and he was instrumental in obtaining a $9.8 million agreement with Regions Bank. His 2022 work alone at Kyndryl was at 394 % of his sales quota which earned him a six-figure bonus. Upon his termination at Kyndryl, it was acknowledged that he was likely responsible for over $1 billion of revenue for the work he performed for IBM and Kyndryl combined.

50.     In response to Blanchard's EEOC complaint, Kyndryl stated Blanchard was not terminated because of his age but because Kyndryl eliminated the entire role of a Sales Partner in the company. In particular, Kyndryl asserted that "instead of Sales Partners it needed the new role of Account Partner, where the focus was on the ability to maintain and develop client relationships, which was viewed as one of the most important qualities for the new role. And unlike the Sales Partner role, the Account Partner served as the overall lead on an account, meaning the Account Partner owned

the customer relationship and served as the subject matter expert on their business." Kyndryl also asserted that "Mr. Blanchard was simply not the most qualified candidate for an Account Partner role, given his lack of key client relationships."

51.    To the contrary, Kyndryl did not eliminate Blanchard's job—they merely changed the title of the job by substituting the word "Account" for the word "Sales." The description they offered for the new role of Account Partner versus the old role of Sales Partner is a distinction without a difference. Kyndryl's proffered basis for its conclusion that Mr. Blanchard was not qualified to be an Account Partner "given his lack of key client relationships" is simply untethered from reality.

52.    Blanchard was also not terminated for performance. His sales performance over many years far exceeded what was required. Blanchard was not terminated because he lacked key qualifications for either the Sales Partner role, or the re-branded Account Partner role. Many years of glowing performance reviews as well as management, peer, and client feedback belie that position.

53.    Instead, Blanchard was terminated by Kyndryl because he fell victim to the illegal ageist scheme created by IBM and adopted and continued by Kyndryl. This discriminatory scheme was previously created by IBM's highest executives—many of whom now populate the leadership ranks of Kyndryl, as discussed *supra*. On information and belief, Kyndryl's executives possess discriminatory animus and adopted IBM's discriminatory standard operating procedure of "fire and hire." This scheme disproportionally targets older workers, like Blanchard, for elimination through layoffs, while simultaneously recruiting, hiring, and protecting young workers. Blanchard was systematically targeted, selected, and terminated solely because of his age. He was a victim of this scheme at Kyndryl, which was adopted as a standard operating procedure following its

spinoff from IBM. Accordingly, but for the ageist scheme and the ageist animus of Kyndryl's highest executives, Blanchard would not have been terminated.

## VI.    <u>CAUSES OF ACTION</u>.

### Count 1: Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et. seq.* ("ADEA").

54.    Plaintiff Blanchard incorporates by reference all allegations in this Complaint.

55.    Kyndryl terminated or constructively terminated Plaintiff Blanchard because of his age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1).

56.    Kyndryl's violation of the ADEA was knowing and willful.

57.    As a direct and proximate result of Kyndryl's age discrimination, Plaintiff Blanchard has lost his job and sustained and will continue to sustain wage and benefit losses and has incurred and will continue to incur out-of-pocket-losses, including attorney's fees and legal costs.

58.    As a direct result of Defendant's pretextual reasons proffered for termination, Plaintiff Blanchard has lost earnings capacity.

### Count 2: Alabama Age Discrimination in Employment Act, Ala.Code § 25-1-21.

59.    Plaintiff Blanchard incorporates by reference all allegations in this Complaint.

60.    Kyndryl terminated Plaintiff Blanchard in violation of the Alabama Age Discrimination in Employment Act.

61.    Kyndryl's violation was knowing and willful.

62.    As a direct and proximate result of Kyndryl's age discrimination, Plaintiff Blanchard lost his job and sustained and will continue to sustain wage and benefit losses and has incurred and will continue to incur out-of-pocket-losses, including attorney's fees and legal costs.

## VII.  <u>JURY DEMAND</u>

63.    Plaintiffs request a trial by jury on all claims against all Defendants.

## VIII.  <u>DAMAGES</u>

64.    WHEREFORE: Plaintiff Blanchard requests the Court to enter judgment and relief as follows:

1) That Kyndryl be ordered to pay Plaintiff Blanchard back pay and benefits with interest;

2) That a final judgment in favor of Plaintiff Blanchard against Kyndryl be entered for liquidated damages in an amount equal to the amount of back pay and benefits due to Plaintiff Blanchard;

3) That Kyndryl be ordered to reinstate Plaintiff Blanchard to his respective former position with all lost pay and benefits, seniority and promotions;

4) That in the alternative to reinstatement, Kyndryl be required to pay Plaintiff Blanchard front pay and benefits in the event reinstatement is not feasible;

5) Penalties available under applicable laws;

6) Costs of this action incurred herein, including expert fees;

7) Attorneys' fees;

8) Pre-judgment and post judgment interest, as provided by law, and

9) Such other and further legal and equitable relief as this Court may deem just and proper.

Respectfully submitted,

WRIGHT & GREENHILL, P.C.
4700 Mueller Blvd., Suite 200
Austin, Texas  78723
512/476-4600
512/476-5382 (Fax)

By:_____
    Heidi A. Coughlin
    State Bar No. 24059615
    hcoughlin@w-g.com
    Brantley Ross Pringle, Jr.
    State Bar No. 16330001
    rpringle@w-g.com

    AND

    PATRICK | DOERR PLLC
    1325 Avenue of the Americas, Floor 28
    New York, New York 10019
    212/680-4052

By: */s/ Mark T. Doerr*_____
    Mark T. Doerr, Esq.
    State Bar No.
    mark.doerr@patrickdoerr.com

    ***ATTORNEYS FOR PLAINTIFF***
    ***RANDY BLANCHARD***

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of May, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to the Court and Defendants' counsel of record.

_____
Heidi A. Coughlin